**FILED - GR**
September 30, 2008 12:20 PM
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:      cr       /

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **1:08-cv-917** |
| Plaintiff, | ) | **Robert J. Jonker** |
| | ) Civil Action No. | **U.S. District Judge** |
| v. | ) | |
| MERIT ENERGY COMPANY, LLC | ) | |
| and | ) | |
| SHELL EXPLORATION & PRODUCTION CO., | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), allege as follows:

### NATURE OF ACTION

1. This is a civil action brought against Merit Energy Company, LLC ("Merit") and Shell Exploration & Production Co. ("Shell") (collectively referred to herein as the "Defendants") pursuant to the Clean Air Act, 42 U.S.C. § 7401 et seq. This action seeks civil penalties and injunctive relief for violation of certain requirements under the Clean Air Act and its implementing regulations at a natural gas processing facility located at 4000 Fisk Road in

Manistee, Michigan (the "Facility"). Shell owned and operated the Facility from the late 1970s until December 1, 2003 and Merit has owned and operated the Facility since then. The Facility has a natural gas sweetening unit that separates acid gas from the sour natural gas that is supplied to the Facility, as well as two sulfur recovery units that recover elemental sulfur from the natural gas. The combustion of sulfur-containing gases that are collected and processed at the Facility results in the airborne emission of sulfur dioxide, which is a regulated air pollutant under the Clean Air Act.

2.  Upon information and belief, the Facility has been and is in violation of regulations implementing the following Clean Air Act statutory and regulatory requirements applicable to the Facility: (i) the Prevention of Significant Deterioration provisions in Part C of Subchapter I of the Act, 42 U.S.C. § 7470-7492; (ii) the federally-enforceable State Implementation Plan developed by the State of Michigan; (iii) New Source Performance Standards ("NSPS") in Section 111 of the Act, 42 U.S.C. § 7411; and (iv) permit requirements in Subchapter V of the Act, 42 U.S.C. § 7661-7661f.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Clean Air Act Sections 113 and 167, 42 U.S.C. §§ 7413 and 7477.

4.  This Court has personal jurisdiction over the Defendants, each of which is a corporation doing business in the State of Michigan, pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b).

5.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1395(a) and Clean Air Act Section 113(b), 42 U.S.C. § 7413(b). The Defendants are found in

and transact business in the Western District of Michigan and certain acts or omissions which form the basis for claims asserted in this Complaint occurred within this District. In addition, the Defendants have agreed to this venue.

### NOTICE TO THE STATE OF MICHIGAN

6. The United States has provided notice of the commencement of this action to the State of Michigan in accordance with the requirements of Clean Air Act Sections 113(a)(1) and 113(b), 42 U.S.C. § 7413(a)(1) and (b).

### DEFENDANTS

7. Defendant Merit Energy Company, LLC (formerly known as Merit Energy Company) is a Delaware limited liability company. Merit currently owns and operates the natural gas processing facility that is the subject of this action.

8. Defendant Shell Exploration & Production Co. is a Delaware corporation. Shell owned and operated the natural gas processing facility that is the subject of this action until December 1, 2003.

9. Each of the Defendants is a "person" as defined in Clean Air Act Section 302(e), 42 U.S.C. § 7602(e).

### GENERAL ALLEGATIONS

10. The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the Nation's air so as to promote the public health and welfare and the productive capacity of its population. Clean Air Act Section 101(b)(1), 42 U.S.C. § 7401(b)(1).

### Prevention of Significant Deterioration Requirements

11. Clean Air Act Section 108(a), 42 U.S.C. § 7408(a), requires EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health

or welfare and the presence of which results from numerous or diverse mobile or stationary sources. For each such "criteria" pollutant, Clean Air Act Section 109, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare. Pursuant to Clean Air Act Sections 108 and 109, EPA has identified and promulgated NAAQS for sulfur dioxide ("$SO_2$") and certain other pollutants.

12. Under Clean Air Act Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is "unclassifiable."

13. Clean Air Act Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS. Upon EPA approval, SIP requirements are federally enforceable under Clean Air Act Section 113, 42 U.S.C. §§ 7413(a), (b); 40 C.F.R. § 52.23.

14. To help ensure attainment and maintenance of the NAAQS, the Clean Air Act requires a comprehensive new source review program with two main facets, which are discussed in greater detail below. The new source review program includes: (i) requirements governing the prevention of significant deterioration in areas designated as attaining the ambient air quality standards (the "PSD" program); and (ii) new source review requirements applicable to areas designated as non-attainment for a particular pollutant (the so-called "Nonattainment New Source Review" program).

15. The PSD program and the Nonattainment New Source Review program both

4

impose a variety of requirements for new or modified sources that would increase emissions of regulated pollutants, including requirements that the source owner/operator obtain a pre-construction permit and take steps to control air pollutant emissions from the source.

16. The Facility at issue in this case is located in Manistee County, Michigan which is in an area that has been designated as in attainment of the NAAQS for $SO_2$. The PSD program requirements therefore govern new source review for $SO_2$ in that area.

17. Part C of Title I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attaining the NAAQS standards. The PSD program requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.

18. Clean Air Act Section 165(a), 42 U.S.C. § 7475(a), prohibits the construction and subsequent operation of a major emitting facility in an area designated as attainment unless a PSD permit has been issued. Section 169(1) of the Act, 42 U.S.C. § 7479(1), defines "major emitting facility" as a source with the potential to emit 250 tons per year or more of any air pollutant.

19. Clean Air Act Sections 110(a)(2)(C) and 161, 42 U.S.C. §§ 7410(a)(2)(C) and 7471, require states to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable. A state may comply with Sections 110(a) and 161 by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as

those set forth at 40 C.F.R. § 51.166. If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 shall be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

20. On August 7, 1980, EPA disapproved Michigan's PSD program and incorporated the federal PSD regulations into the Michigan SIP at 40 C.F.R. § 52.1180(b) (45 Fed. Reg. 52,741 (Aug. 7, 1980)). On March 10, 2003, EPA incorporated revised provisions of the federal PSD regulations into the Michigan SIP at 40 C.F.R. § 52.1180(b) (68 Fed. Reg. 11,323 (Mar. 10, 2003)). All conduct relevant to the PSD program violations alleged in this complaint occurred before the 2003 revisions to the federal PSD regulations, and those regulations did not apply retroactively, so all references herein are to the pre-2003 regulations.

21. As set forth at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

22. As set forth at 40 C.F.R. § 52.21(i), any major emitting source in an attainment area that intends to construct a major modification must first obtain a PSD permit. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as meaning any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the Act. "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase or the potential of a source to emit any of the following criteria pollutants, at a rate of emissions that would equal or exceed pollutant specified thresholds (such as 40 tons per year for $SO_2$).

23.     As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification in an attainment area shall install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Clean Air Act that it would have the potential to emit in significant quantities.

24.     Pursuant to the PSD regulations, any owner or operator who commences construction or modification of a major source without applying for and receiving approval for such construction or modification is subject to an enforcement action. 40 C.F.R. § 52.21(s).

### New Source Performance Standards

25.     Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of EPA to publish a list of categories of stationary sources that emit or may emit any air pollutant. The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.

26.     Clean Air Act Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), requires the Administrator of EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories. "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source. 42 U.S.C. § 7411(a)(2).

27.     Pursuant to Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), EPA has identified onshore natural gas processing facilities as one category of stationary sources of $SO_2$ emissions that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

28.     Pursuant to Clean Air Act Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), EPA

promulgated New Source Performance Standards ("NSPS") for various industrial categories, including onshore natural gas processing facilities. NSPS requirements for onshore natural gas processing facilities are codified at 40 C.F.R. Part 60, Subpart LLL ("NSPS Subpart LLL").

29. NSPS Subpart LLL applies to specified "affected facilities" that process natural gas, including each sweetening unit and each sweetening unit followed by a sulfur recovery unit that commenced construction or modification after January 20, 1984. 40 C.F.R. § 60.640(a), (d). A sweetening unit is a process device that separates "acid gas" (which consists of hydrogen sulfide and carbon dioxide) from a "sour" (or sulfur-containing) natural gas stream. A sulfur recovery unit is a process device that recovers elemental sulfur from the acid gas. Id. at § 60.641.

30. NSPS Subpart LLL establishes standards governing the emission of $SO_2$ (and reduced sulfur compounds that may be converted to $SO_2$) from any affected sweetening unit or sweetening followed by a sulfur recovery unit, which are expressed as minimum $SO_2$ emission reduction efficiencies. The minimum emission reduction efficiencies for a particular unit are expressed as percentages that depend upon the unit's total daily sulfur feed rate and the hydrogen sulfide content of the acid gas feed. 40 C.F.R. § 60.642.

31. NSPS Subpart LLL also imposes testing, monitoring, recordkeeping, and reporting obligations that are designed to ensure initial and ongoing compliance with the $SO_2$ emission standards and associated requirements. 40 C.F.R. §§ 60.644-60.648.

32. Pursuant to Clean Air Act Section 111(b), 42 U.S.C. § 7411(b), EPA has promulgated general NSPS provisions, codified at 40 C.F.R. Part 60, Subpart A, §§ 60.1-60.19, that apply to owners or operators of any stationary source that contains an "affected facility" subject to regulation under 40 C.F.R. Part 60.

33. 40 C.F.R. § 60.11(d) requires that at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.

34. Among other things, the duty to employ good air pollution control practices to minimize emissions under 40 C.F.R. § 60.11(d) imposes an obligation to take appropriate steps to minimize the flaring of sulfur-containing gases that may be handled or generated at a natural gas processing facility that is an affected facility under NSPS Subpart LLL.

35. Clean Air Act Section 111(e), 42 U.S.C. § 7411(e), prohibits the operation of any new source in violation of NSPS requirements applicable to such source. Thus, a violation of an NSPS requirement is a violation of Clean Air Act Section 111(e).

## State Implementation Plan Requirements
## Regarding Abnormal Conditions and Breakdown of Equipment

36. On May 6, 1980, EPA approved Mich. Admin. Code r. 336.1912 (1980) ("Rule 912") as part of the federally-enforceable SIP for Michigan. 45 Fed. Reg. 29,790 (May 6, 1980).

37. Rule 912 requires the owner or operator of a source of air emissions to provide notice and a written report of any abnormal conditions in, or breakdown of, process or control equipment that results in emission of any air contaminant continuing for more than two hours in excess of any applicable emission limit.

## Title V Permit Requirements

38. Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources." The purpose of Title V is to

ensure that all "applicable requirements" for compliance with the Clean Air Act, including PSD and NSPS requirements, are collected in one place.

39.     Pursuant to Clean Air Act Section 502(b), 42 U.S.C. § 7661a(b), EPA promulgated regulations establishing the minimum elements of a Title V permit program to be administered by any air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992). Those regulations are codified at 40 C.F.R. Part 70.

40.     Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b) provide that, after the effective date of any air permit program approved or promulgated under Title V, no source subject to Title V may operate except in compliance with a Title V permit.

41.     EPA granted interim approval of the State of Michigan's Title V operating permit program, which took effect on February 10, 1997. EPA granted final approval effective on November 30, 2001. 40 C.F.R. Part 70, Appendix A. Michigan's Title V operating permit program is codified at Mich. Admin. Code r. 336.1210-336.1218 ("Rules 210-218").

42.     Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a), and Michigan's Title V operating permit program regulations have at all relevant times made it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

43.     Clean Air Act Section 504(a), 42 U.S.C. § 7661c(a), EPA's implementing regulations at 40 C.F.R. § 70.6(a)(1), and Michigan's Rule 213 have at all relevant times required that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Clean Air Act and the requirements of the applicable SIP, including any applicable PSD requirement to comply with an emission rate that meets BACT, and any applicable NSPS

requirements.

44. Rule 213 in Michigan's Title V operating permit regulations specifies that all terms and conditions of a Title V operating permit that are designated in the permit as federally enforceable are enforceable by EPA under the provisions of the Clean Air Act.

45. Clean Air Act Section 503(c), 42 U.S.C. § 7661b(c), EPA's Title V regulations at 40 C.F.R. §§ 70.5(a) and (c), and the pertinent provisions of Michigan's Title V regulations have at all relevant times required that any application for a Title V permit be complete and include, *inter alia*, the citation and description of all requirements applicable to the source and a description and compliance plan for requirements for which the source is not in compliance.

### Clean Air Act Enforcement Provisions

46. Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for a permanent or temporary injunction, and/or for a civil penalty, whenever any person has violated: (i) any requirement or prohibition of any applicable SIP or permit; or (ii) any other requirement or prohibition under a pertinent provision of the Clean Air Act, including, but not limited to, any NSPS requirement.

47. Clean Air Act Section 167, 42 U.S.C. § 7477, authorizes the United States to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD program requirements.

48. As provided by Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates pertinent requirements of the Clean Air Act shall be liable for a civil penalty of up to: (i) $25,000 per day for each such violation occurring on or before January 30, 1997; (ii) $27,500 per day for each

violation occurring between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

### FIRST CLAIM FOR RELIEF
(PSD Violations Due to Unpermitted Modifications)

49. Paragraphs 1 through 48 are realleged and incorporated by reference as if fully set forth herein.

50. The Defendants have owned and operated a sweetening plant and two sulfur recovery units ("SRUs") at the Facility. The Defendants have generally referred to the two SRUs as SRU A and SRU B.

51. Between at least 1995 and 1998, each of the two SRUs at the Facility was modified. Among other things, physical changes were made to SRU B to enhance its ability to process increased volumes of acid gas and physical changes were made to SRU A to reactivate that unit, which had been shut down since 1989. As a result of those modifications, the Facility was able to process larger volumes of sour natural gas that began being supplied to the Facility under a 1996 gas treating and processing agreement with West Shore Processing Co., LLC.

52. The modifications to the SRUs constituted "major modifications" under the Clean Air Act and the applicable PSD program regulations, to existing major stationary sources, that resulted in a significant net emissions increase of $SO_2$.

53. Since the major modification of those SRUs, Shell and Merit have been in violation of the Clean Air Act and the applicable PSD program regulations, by failing to undergo an appropriate new source review, by failing to obtain required PSD permits, and by failing to install and operate the best available control technology for the control of $SO_2$ emissions.

54. Unless restrained by an Order of the Court, these violations of the Clean Air Act

and the applicable PSD program regulations will continue.

55.   The Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## SECOND CLAIM FOR RELIEF
(NSPS Subpart LLL Violations)

56.   Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

57.   The sweetening unit and SRUs at the Facility constitute a "sweetening unit" and a "sweetening unit followed by a sulfur recovery unit" within the meaning of 40 C.F.R. § 60.640(a) and § 60.641, and a "stationary source" within the meaning of Clean Air Act Sections 111(a)(3) and 302(z), 42 U.S.C. §§ 7411(a)(3) and 7602(z).

58.   The SRU modifications that are described above constituted "modifications" to an existing facility as defined by the NSPS regulations, 40 C.F.R. § 60.14. By virtue of those modifications, the sweetening unit and SRUs at the Facility are "affected facilities" within the meaning of 40 C.F.R. §§ 60.2 and 60.640(a), and "new sources" within the meaning of Clean Air Act Section 111(a)(2), 42 U.S.C. § 7411(a)(2).

59.   The sweetening unit and SRUs at the Facility therefore are subject to the Standards of Performance for Onshore Natural Gas Processing: $SO_2$ Emissions, 40 C.F.R. Part 60, Subpart LLL.

60.   Among other requirements imposed by NSPS Subpart LLL, air emissions from the sweetening unit and SRUs are subject to the NSPS Subpart LLL emission limitation for $SO_2$

that is imposed by 40 C.F.R. § 60.642(b). At various times in the past, including on several occasions in 2003, the $SO_2$ emissions from the sweetening unit and SRUs exceeded the emission limitation imposed by 40 C.F.R. § 60.642(b).

61. At times in the past, the Defendants have also failed to comply with other requirements under NSPS Subpart LLL, including the obligation to: (i) demonstrate compliance with the emission limitation under 40 C.F.R. § 60.642(a) in an initial performance test; (ii) perform daily monitoring as required by 40 C.F.R. § 60.646; (iii) keep and maintain records required by 40 C.F.R. § 60.647(a); and (iv) provide written reports of excess emissions, as required by 40 C.F.R. § 60.647(b).

62. Unless restrained by an Order of the Court, these violations of the Clean Air Act and the applicable NSPS regulations will continue.

63. The Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

**THIRD CLAIM FOR RELIEF**
**(Failure to Operate and Maintain an Affected Facility and Associated Control Equipment in a Manner Consistent with Good Air Pollution Control Practice for Minimizing Emissions, as Required by NSPS Subpart A, 40 C.F.R. § 60.11(d))**

64. The allegations in Paragraphs 1 through 62 are hereby realleged and incorporated by reference as if fully set forth herein.

65. The sweetening unit and SRUs at the Facility are subject to the New Source Performance Standards General Provisions, NSPS Subpart A, including the requirements of 40

C.F.R. § 60.11(d).

66. Under circumstances that did not represent good air pollution control practice for minimizing emissions, the Defendants have at various times in the past emitted $SO_2$ from flaring devices at the Facility, in violation of 40 C.F.R. § 60.11(d).

67. Unless restrained by an Order of the Court, these violations of the Clean Air Act and the applicable NSPS regulations will continue.

68. The Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

### FOURTH CLAIM FOR RELIEF
**(Failure to Comply with SIP Requirements of Mich. Admin. Code r. 336.1912 (1980))**

69. The allegations in Paragraphs 1 through 68 are hereby realleged and incorporated by reference as if fully set forth herein.

70. On various occasions in the past, the Defendants have failed to provide notice and/or a written report of abnormal conditions in, or breakdown of, process or control equipment that resulted in emission of any air contaminant continuing for more than two hours in excess of any applicable emission limit, in violation of Mich. Admin. Code r. 336.1912 (1980). More specifically, the Defendants have failed to provide notice and a written report on multiple instances when $SO_2$ emissions from flaring devices at the Facility exceeded the emission limits imposed by the Facility's Title V permit for more than two hours.

71. Unless restrained by an Order of the Court, these violations of the Clean Air Act

and Mich. Admin. Code r. 336.1912 will continue.

72. The Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

### FIFTH CLAIM FOR RELIEF
### (Title V Violations Arising From Failure to Incorporate Applicable PSD and NSPS Requirements )

73. The allegations in Paragraphs 1 through 72 are realleged and incorporated by reference as if fully set forth herein.

74. As described above, modifications were made to the SRUs at the Facility which constituted both: (i) major modifications under the PSD regulations; and (ii) modifications to an existing facility under the NSPS regulations. Those modifications triggered the requirements, *inter alia*, to obtain a PSD permit establishing emissions limitations that meet BACT, to operate in compliance with BACT, and to comply with NSPS Subparts A and LLL. The Defendants failed to satisfy those requirements.

75. On or about October 8, 1996, Shell submitted an application to the Michigan Department of Environmental Quality ("MDEQ") for a Title V permit for the Facility. In doing so, Shell failed to submit a complete application that included enforceable emission limits, identified all applicable requirements (including the requirement to meet BACT pursuant to the PSD regulations and to comply with NSPS Subparts A and LLL), accurately certified compliance with such requirements, and contained a compliance plan for all applicable requirements for which the Facility was not in compliance (including the requirement to meet

BACT pursuant to the PSD regulations and to comply with NSPS Subparts A and LLL), in violation of Clean Air Act Section 503(c), 42 U.S.C. § 7661b(c), EPA's Title V regulations at 40 C.F.R. §§ 70.5(a) and (c), and the pertinent provisions of Michigan's Title V regulations.

76. MDEQ issued Shell a Title V permit for the Facility on February 22, 2000. Upon assuming ownership of the Facility, Merit sought and received an administrative amendment to the Facility's Title V permit that substituted Merit as the permitted owner and operator of the Facility. MDEQ issued Merit a renewed Title V operating permit for the Facility which took effect on August 27, 2007.

77. Since becoming the owner and operator of the Facility, Merit has failed to supplement and/or correct the previously-submitted Title V application in order to: include enforceable emission limits; identify all applicable requirements (including the requirement to meet BACT pursuant to PSD and to comply with NSPS); accurately certify compliance with such requirements; and include a compliance plan for all applicable requirements for which the Facility was not in compliance (including the requirement to meet BACT pursuant to the PSD regulations and to comply with NSPS Subparts A and LLL). Merit's failure to do so violated Clean Air Act Section 503(c), 42 U.S.C. § 7661b(c), EPA's Title V regulations at 40 C.F.R. §§ 70.5(b), and the corresponding provisions of Rule 210(2)(b) in Michigan's Title V regulations.

78. The Defendants have operated the Facility without having a valid Title V operating permit that requires compliance with BACT and NSPS Subparts A and LLL or contains a compliance plan for coming into compliance with BACT and NSPS Subparts A and LLL, in violation of Clean Air Act Sections 502(a) and 504(a), 42 U.S.C. §§ 7661a(a), 7661c(a), EPA's Title V regulations at 40 C.F.R. §§ 70.6(a), (c), and the pertinent provisions of

Michigan's Title V regulations.

79. Unless restrained by an Order of the Court, these violations of the Clean Air Act and the applicable Title V regulations will continue.

80. Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

### SIXTH CLAIM FOR RELIEF
### (Title V Operating Permit Violations)

81. The allegations in Paragraphs 1 through 80 are realleged and incorporated by reference as if fully set forth herein.

82. Since at least 2000, the Title V operating permit for the Facility has limited the total $SO_2$ emissions from the Facility to no more than 3,970 pounds in a consecutive 24 hour time period. In addition, since at least 2000, the Title V operating permit for the Facility has limited the total $SO_2$ emissions from the Facility to no more than 1,000 pounds per hour during any startup or malfunction of the SRUs' Claus system. The Defendants have in the past exceeded one or both of those operating permit limits, in violation of the Facility's Title V permit, the pertinent provisions of Michigan's Title V regulations, and Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a).

83. Unless restrained by an Order of the Court, these violations of the Clean Air Act and the applicable Title V regulations will continue.

84. Defendants' violations of the Clean Air Act, as set forth in this Claim for Relief,

make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

1. Order the Defendants to immediately comply with the statutory and regulatory requirements cited in this Complaint;

2. Order the Defendants to take appropriate measures to mitigate the effects of their violations;

3. Assess civil penalties against the Defendants for up to the amounts provided in the applicable statutes; and

4. Grant the United States such other relief as this Court deems just and proper.

*Signature Page for Complaint in*
*United States v. Merit Energy Company, LLC and Shell Exploration & Production Co. (W.D. Mich.)*

FOR THE UNITED STATES OF AMERICA

Date: 8/22/08

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20530

Date: 9/30/2008

RANDALL M. STONE
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1308


CHARLES R. GROSS
Interim United States Attorney

MICHAEL L. SHIPARSKI
Assistant United States Attorney
Western District of Michigan
P.O. Box 208
Grand Rapids, MI 49503
(616) 456-2404

OF COUNSEL:

CHRISTINE M. LISZEWSKI
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Boulevard
Chicago, IL 60604

20