IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) |
| | ) |
| MERIT ENERGY COMPANY, LLC | ) |
| | ) |
| and | ) |
| | ) |
| SHELL EXPLORATION & | ) |
| PRODUCTION CO., | ) |
| | ) |
| Defendants. | ) |
| | ) |

FILED (GR)
U.S. District Court Clerk
Ronald C. Weston, Sr.

SEP 0 9 2008

By_____
Western Michigan

**CONSENT DECREE**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION AND VENUE | 2 |
| III. | APPLICABILITY | 3 |
| IV. | DEFINITIONS | 4 |
| V. | CIVIL PENALTY | 7 |
| VI. | COMPLIANCE REQUIREMENTS | 8 |
| VII. | SUPPLEMENTAL ENVIRONMENTAL PROJECT | 23 |
| VIII. | POLLUTION ALLOWANCES | 26 |
| IX. | REPORTING REQUIREMENTS | 26 |
| X. | STIPULATED PENALTIES | 28 |
| XI. | FORCE MAJEURE | 34 |
| XII. | DISPUTE RESOLUTION | 36 |
| XIII. | INFORMATION COLLECTION AND RETENTION | 38 |
| XIV. | EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS | 40 |
| XV. | COSTS | 42 |
| XVI. | NOTICES | 42 |
| XVII. | EFFECTIVE DATE | 44 |
| XVIII. | RETENTION OF JURISDICTION | 44 |
| XIX. | MODIFICATION | 45 |
| XX. | TERMINATION | 45 |
| XXI. | PUBLIC PARTICIPATION | 46 |
| XXII. | SIGNATORIES/SERVICE | 47 |
| XXIII. | INTEGRATION/APPENDICES | 47 |
| XXIV. | FINAL JUDGMENT | 48 |

## I. BACKGROUND

A.      Plaintiff, the United States of America, on behalf of the United States

Environmental Protection Agency ("EPA"), has filed a Complaint in this action, pursuant to

Sections 113(b), 165, and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413, 7475, and

7477, concurrently with this Consent Decree alleging that Defendants Shell Exploration &

Production Company ("Shell") and Merit Energy Company, LLC ("Merit") violated various

provisions of the Act. The Complaint seeks injunctive relief and civil penalties for violations of,

*inter alia*: (i) the Prevention of Significant Deterioration ("PSD") provisions in Part C of

Subchapter I of the Act, 42 U.S.C. §§ 7470-7492; (ii) the federally-enforceable state

implementation plan developed by the State of Michigan; (iii) New Source Performance

Standards ("NSPS") in Section 111 of the Act, 42 U.S.C. § 7411; and (iv) permit requirements in

Subchapter V of the Act, 42 U.S.C. § 7661 *et seq*.

B.      The Complaint against Defendants alleges that, *inter alia*, Defendants made major

modifications at the Manistee 23 natural gas processing plant located at 4000 Fisk Road in

Manistee, Michigan (the "Facility"), while failing to obtain the required permits and install the

controls necessary under the Act to reduce sulfur dioxide emissions from the Facility, and further

alleges that such emissions damage human health and the environment. The sweetening unit at

the Facility is capable of processing approximately 35 million standard cubic feet per day of sour

gas. The Facility currently has two Claus sulfur recovery units, each utilizing three stages of

catalytic conversion. Each of the two sulfur recovery units is capable of processing

approximately 12.5 long tons per day of inlet sulfur (or 25 long tons per day in the aggregate).

The acid gas that is processed by those sulfur recovery units typically contains between 20-50%

hydrogen sulfide. The Claus sulfur recovery units at the Facility currently operate at

1

significantly less than their full capacity, and they generally process less than 6 long tons per day of inlet sulfur (in the aggregate).

C.     Shell owned and/or operated the Facility from the late 1970s until December 1, 2003 and Merit has owned and/or operated the Facility since then.

D.     EPA issued notices of violation and findings of violation to Defendants with respect to such allegations on September 21, 2005 and November 16, 2005.

E.     Defendants do not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

F.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section II, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II. JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and over the Parties, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477. Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Defendants conduct business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and any such action and over Defendants and consent to venue in this judicial district.

2

2.      For purposes of this Consent Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 113, 165, and 167 of the Act, 42 U.S.C. §§ 7413, 7475, and 7477, and 28 U.S.C. § 1355.

## III. APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law. Whenever this Consent Decree references an obligation to be borne by Merit, Merit shall bear sole responsibility for ensuring performance of that obligation.

4.      Transfer of Facility.

a.      Civil Penalty Payment Obligation. No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to comply with the terms of Consent Decree Section V (Civil Penalty).

b.      Other Obligations Applicable to Merit, as the Current Owner and Operator of the Facility. No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Merit of its obligation to ensure that the terms of the Decree are implemented, unless: (i) the transferee agrees to undertake Merit's obligations under this Decree and to be substituted as a Party under the Decree and thus be bound by the terms thereof; and (ii) the United States consents to relieve Merit of its obligations. The United States may refuse to approve the substitution of the transferee for Merit if it determines that the proposed transferee does not possess the requisite technical abilities or the financial means to ensure compliance with the Consent Decree. The United States' decision to refuse to approve the substitution of the transferee for Merit shall not be subject to judicial

3

review. At least 30 Days prior to such transfer, Merit shall provide a copy of this Consent Decree to the proposed transferee and shall provide written notice of the prospective transfer, together with a copy of the proposed written transfer agreement, to EPA and the United States Department of Justice, in accordance with Section XVI of this Decree (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree by Merit and Merit shall remain liable under the terms of this Decree.

5.      Merit shall provide a copy of this Consent Decree to all officers and employees whose duties might reasonably include compliance with any provision of this Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV. DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Acid Gas" or "AG" shall mean a gas stream of hydrogen sulfide ($H_2S$) and carbon dioxide ($CO_2$) that has been separated from sour natural gas by a sweetening unit.

"Acid Gas Injection" or "AGI" shall mean a system in which Acid Gas from the Facility is injected into an underground formation for permanent storage.

"Clean Air Act" or "Act" shall mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

"Complaint" shall mean the complaint filed by the United States in this action.

4

"Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXIII).

"Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Western District of Michigan.

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

"Defendants" shall mean Merit Energy Company, LLC and Shell Exploration & Production Co.

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

"Effective Date" shall have the definition provided in Section XVII.

"Facility" shall mean the Manistee 23 natural gas processing plant located at 4000 Fisk Road in Manistee, Michigan and currently owned and operated by Merit.

"$H_2S$" shall mean hydrogen sulfide.

"Malfunction," as specified by 40 C.F.R. § 60.2, shall mean: "[A]ny sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions."

"Merit" shall mean Defendant Merit Energy Company, LLC (formerly known as Merit Energy Company).

5

"Michigan Department of Environmental Quality" or "MDEQ" shall mean the Michigan Department of Environmental Quality and any of its successor departments or agencies.

"Paragraph" shall mean a portion of this Decree identified by an arabic numeral.

"Parties" shall mean the United States and Defendants.

"Reduction Efficiency" (also called "removal efficiency" in the Facility's Title V Permit) shall mean the $SO_2$ emission reduction efficiency achieved by an SRU, as computed in accordance with the test methods and procedures set forth in 40 C.F.R. § 60.644. In calculating any Reduction Efficiency for the purpose of determining compliance with a requirement under this Consent Decree, the computed sulfur emission rate shall include any emissions of $SO_2$ or reduced sulfur compounds from SRU sulfur pit vapors.

"Root Cause" shall mean the primary cause(s) of a Flaring Incident(s), as determined through a process of investigation.

"Section" shall mean a portion of this Decree identified by a Roman numeral.

"Shell" shall mean Defendant Shell Exploration & Production Company.

"$SO_2$" shall mean sulfur dioxide.

"Startup" shall mean the setting in operation of equipment for any purpose.

"Shutdown" shall mean the cessation of operation of equipment for any purpose.

"Sulfur Recovery Unit" or "SRU" shall mean a process device that recovers elemental sulfur from acid gas.

"Sweetening Unit" shall mean a process device that separates the $H_2S$ and $CO_2$ contents from the sour natural gas stream.

"State" shall mean the State of Michigan.

6

"Supplemental Environmental Project" or "SEP" shall mean the supplemental environmental project performed pursuant to Section VII.

"Title V Permit" shall mean the Renewable Operating Permit No. MI-ROP-B6013-2007 issued by the MDEQ to Merit on August 27, 2007 as well as any permit amendment or renewal of Renewable Operating Permit No. MI-ROP-B6013-2007.

"United States" shall mean the United States of America, acting on behalf of EPA.

## V. CIVIL PENALTY

8.    Initial Payment by the Defendants.  Within five working days after the Court's entry of an order allowing the Defendants to make a payment into the Court Registry Account of the United States District Court for the Western District of Michigan, the Defendants shall pay the sum of $500,000 into that account. Merit and Shell shall bear joint and several responsibility for ensuring performance of that payment obligation. Payment shall be made to the Clerk of the Court by an electronic funds transfer ("EFT") to the account designated by the Clerk of the Court, using the following wire transfer instructions:

| | |
|---|---|
| Receiving Bank ABA Routing Number: | 072403473 |
| Wire Amount: | $500,000 |
| Receiver Financial Institution: | 021030004 TREAS NY |
| Beneficiary: | D 00004640 USDC MIW |

In making the EFT, the Defendants shall also reference the case number assigned to this action and the Defendants' names. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall reference the case name and DOJ case number 90-5-2-1-09003, to the United States in accordance with Section XVI of this Decree (Notices).

7

9.    Disbursements from the Court Registry Account. After entry of this Consent

Decree, the funds deposited into the Court Registry Account under this Consent Decree (and all

accrued interest) shall be disbursed pursuant to a separate Withdrawal Order of the Court, which

shall provide for payment of $500,000 (plus all accrued interest) to the United States, as a civil

penalty. In the event the United States withdraws or withholds its consent to this Consent

Decree before entry, or the Court declines to enter the Consent Decree, the funds deposited into

the Court Registry Account (and all accrued interest) shall be returned to the Defendants

pursuant to a separate Withdrawal Order of the Court.

10.    Neither Defendant shall deduct any penalties paid under this Decree pursuant to

this Section or Section X (Stipulated Penalties) in calculating its federal income taxes.

## VI. COMPLIANCE REQUIREMENTS

### A.    Compliance with New Source Performance Standards

11.    NSPS Applicability and Compliance.

a.    Upon the Lodging Date, each sweetening unit and each sweetening unit

followed by a sulfur recovery unit at the Facility shall be an "affected facility" as that term is

used in 40 C.F.R. Part 60, Subparts A and LLL, and shall be subject to, and comply with the

requirements of NSPS Subparts A and LLL.

b.    Beginning on the Lodging Date, and consistent with the requirements

imposed by 40 C.F.R. § 60.11(d), Merit shall maintain and operate each affected facility and all

associated air pollution control equipment at all times (including during periods of startup,

shutdown, and malfunction) in a manner consistent with good air pollution control practices for

minimizing emissions.

8

**B.    Interim Emission Standard**

12.    Normal Operations.  Beginning on the Lodging Date, and continuing until implementation of the Final Pollution Control Measures as required by Subsection VI.C, Merit shall operate any SRU at the Facility to achieve at least a 95.5% Reduction Efficiency whenever the total inlet volume to the Facility is 1 million cubic feet of gas per day or greater. The SRU's Reduction Efficiency shall be calculated on a daily basis whenever any SRU is operating, but compliance with the 95.5% Reduction Efficiency interim emission standard specified by this Paragraph shall be determined based on a 30-day rolling average, and the average shall exclude any days on which the total inlet volume to the Facility was less than 1 million cubic feet of gas. When any SRU is operating and the total inlet volume to the Facility is less than 1 million cubic feet of gas per day, the emissions of $SO_2$ shall not exceed 600 pounds per day.

13.    Malfunctions and Abnormal Conditions.  If any Malfunction or abnormal condition requires Merit to temporarily limit or discontinue use of an operating SRU and to bypass any portion of the Acid Gas to the emergency flare, Merit shall immediately curtail all process inflow streams to the Facility to minimal levels and shall otherwise operate the Facility in a manner consistent with good air pollution control practices for minimizing emissions. If the Malfunction or abnormal condition is not remedied within 240 minutes, Merit shall commence shut-in and immediately stop routing any process inflow streams to the Facility unless or until the Acid Gas can be re-routed to the SRU.

**C.    Final Pollution Control Measures**

14.    Merit shall fully implement one of the Final Pollution Control options set forth below in Subsections VI.C.1 and VI.C.2 in accordance with all the requirements set forth in the applicable subsection.

9

**1.     Acid Gas Injection**

15.     Generally. If Merit chooses an Acid Gas Injection ("AGI") system to comply with the requirements of Subsection VI.C, Merit shall comply with all requirements set forth in this Subsection VI.C.1.

16.     Emissions Control. Merit shall install and continuously operate a separately-permitted AGI system for the Facility beginning no later than September 1, 2009. Merit shall not allow any air emissions of $SO_2$ or $H_2S$ from the Facility, except as permitted during times of Malfunction.

17.     AGI Permits. This Consent Decree is not a permit, and nothing in this Consent Decree grants Merit the right to install and operate AGI at the Facility. Merit shall not construct or operate AGI at the Facility except pursuant to a duly-issued permit from EPA and the relevant State regulatory authorities.

18.     Existing SRUs. Merit shall permanently shut down and cease operation of the two existing SRUs at the Facility no later than October 1, 2009 and, after that date, Merit shall not allow any air emissions of $SO_2$ or $H_2S$ from the SRUs (including any sulfur pits associated with the SRUs) and the incinerator that has been used to combust gases from the SRUs. Merit shall take all necessary steps to seek deletion of provisions relating to the SRUs from the Facility's Title V Permit or otherwise re-permit the Facility in a manner that precludes operation of the existing SRUs.

19.     Monitoring. At least 90 Days before commencing operation of any AGI system under this Subsection VI.C, Merit shall prepare an $H_2S$ Monitoring Plan for the Facility and shall submit the Plan to EPA in accordance with Consent Decree Subsection VI.F. The Plan shall include, at a minimum, a diagram showing the location of all monitors at the Facility, a

10

description of the monitoring equipment and the alarm systems and levels that will be utilized, and an overall plan for ensuring that the monitors will be operated at all times when the Sweetening Unit is operating. At least 30 Days before implementing any changes to its $H_2S$ Monitoring Plan, Merit shall submit a modified or amended Plan to EPA in accordance with Consent Decree Subsection VI.F. Merit shall operate the Facility in compliance with the $H_2S$ Monitoring Plan at all times unless EPA has notified Merit that it has disapproved Merit's Plan (or a modified or amended Plan) pursuant to Consent Decree Subsection VI.F. EPA does not, by its failure to disapprove any Plan that is submitted by Merit, warrant that the Plan will result in compliance with applicable legal requirements.

20.    Malfunctions and Abnormal Conditions. If any Malfunction or abnormal condition threatens or causes the airborne emission of $SO_2$ or $H_2S$ from the Facility, Merit shall immediately curtail all process inflow streams to the Facility to minimal levels and shall otherwise operate the Facility in a manner consistent with good air pollution control practices for minimizing emissions. If the Malfunction or abnormal condition is not remedied within 240 minutes, Merit shall commence shut-in and immediately stop routing any process inflow streams to the Facility. Among other situations, there will be deemed to be a Malfunction or abnormal condition whenever the Facility's continuous monitoring system detects gas flow to the Facility's emergency flare.

**2.    Facility Shutdown**

21.    Generally. If Merit chooses to comply with the requirements of Subsection VI.C by shutdown, Merit shall cease all emissions-generating operations at the Facility by no later than September 1, 2009 and shall surrender its Title V Permit for the Facility by no later than October 1, 2009.

11

22.     Merit may choose to restart the Facility after shutdown. In such an event, the Facility shall be considered a new source for purposes of State and federal clean air laws and regulations. Merit shall notify the United States, as provided in Section XVI (Notices), of its intent to restart the Facility before applying for the necessary permits.

**D.     Compliance with Permit Requirements**

23.     In addition to complying with all requirements of this Consent Decree, Merit shall maintain full compliance with all terms and conditions of its permits for the Facility including, but not limited to, the Title V Permit, any other operating permits, and any minor or major new source review permits.

**E.     Control of Flaring**

24.     General Flaring Requirements.

a.      The parties acknowledge that certain requirements under this Subsection VI.E may be more stringent than corresponding requirements in Merit's existing Title V Permit.

b.      Except in the event of an SRU Malfunction or an AGI System Malfunction, Merit shall not bypass any portion of the Acid Gas to the emergency flare.

c.      If any portion of the Acid Gas is bypassed to the emergency flare, Merit shall minimize the emissions associated with the flaring by immediately curtailing all process inflow streams to the Facility to minimal levels and otherwise operating the Facility in a manner consistent with good air pollution control practices for minimizing emissions. If the Malfunction or abnormal condition is not remedied within 240 minutes, Merit shall commence shut-in and immediately stop routing any process inflow streams to the Facility unless or until the Acid Gas can be re-routed to the SRU (used for interim emission control under Subsection VI.B) or the AGI System.

12

d.    Merit shall minimize the emissions from flaring associated with a scheduled SRU shutdown and a subsequent SRU startup by formalizing and implementing a standard operating procedure for shutting-in the Acid Gas to the Facility and, thereby, the sour gas inlet to the Sulfinol absorber such that the sour solution feeding the Sulfinol stripper will contain a progressively declining amount of $H_2S$ and assist in minimizing the $SO_2$ emissions from the Emergency Flare during the scheduled SRU shutdown.

25.    Requirements for Significant Flaring Incidents.

a.    For the purpose of this Consent Decree, the term "Flaring Incident" means any flaring of gases at the Facility that results in the emission of: (i) at least five hundred (500) pounds of sulfur dioxide in a 24-hour period; or (ii) a lesser amount of sulfur dioxide in any 24-hour period, if such emissions exceed the allowable emissions of that pollutant under any permit for the Facility. Instances of flaring separated by any period without flaring shall be considered separate Flaring Incidents.

b.    As specified by this Subsection VI.E, beginning with the Date of Lodging, Merit shall investigate the cause of any Flaring Incident, take reasonable steps to correct the conditions that have caused or contributed to such Flaring Incident, and minimize Flaring Incidents at the Facility. Merit shall continue to follow the Flaring Incident investigation and corrective action procedures outlined in this Subsection VI.E after termination of this Consent Decree. The parties acknowledge that the certain requirements under this Subsection may be more stringent than corresponding requirements in Merit's existing Title V Permit.

26.    Investigation and Reporting. No later than 45 Days following the end of a Flaring Incident occurring after the Date of Lodging, Merit shall submit to EPA a report that sets forth the following:

13

i.       The date and time that the Flaring Incident started and ended. To the
extent that the Flaring Incident involved multiple releases either within a 24 hour period or
within subsequent, contiguous, non-overlapping 24 hour periods, Merit shall set forth the starting
and ending dates and times of each release;

ii.       An estimate of the quantity of sulfur dioxide that was emitted and the
calculations that were used to determine that quantity;

iii.       The steps, if any, that Merit took to limit the duration and/or quantity of
sulfur dioxide emissions associated with the Flaring Incident;

iv.       A detailed analysis that sets forth the Root Cause and all significant
contributing causes of that Flaring Incident, to the extent determinable;

v.       An analysis of the measures, if any, available to reduce the likelihood of a
recurrence of a Flaring Incident resulting from the same Root Cause or significant contributing
causes in the future. If two or more reasonable alternatives exist to address the Root Cause, the
analysis shall discuss the alternatives, if any, that are available, the probable effectiveness and
cost of the alternatives, and whether or not an outside consultant should be retained to assist in
the analysis. Possible design, operation, and maintenance changes shall be evaluated. If Merit
concludes that Corrective Action(s) is (are) required under Paragraph 27 (Corrective Action), the
report shall include a description of the action(s) and, if not already completed, a schedule for its
(their) implementation, including proposed commencement and completion dates. If Merit
concludes that corrective action is not required under Paragraph 27 (Corrective Action), the
report shall explain the basis for that conclusion;

vi.       A statement that: (a) specifically identifies each of the grounds for
stipulated penalties in Paragraphs 29 and 30 of this Decree and describes whether or not the

14

Flaring Incident falls under any of those grounds, provided, however, that Merit may choose to submit with the Root Cause analysis a payment of stipulated penalties in the nature of settlement without the need to specifically identify the grounds for the penalty. Such payment of stipulated penalties shall not constitute an admission of liability, nor shall it raise any presumption whatsoever about the nature, existence, or strength of Merit's potential defenses; (b) if a Flaring Incident falls under Paragraph 30 of this Decree, describes which Subparagraph (*i.e.*, 30.a or 30.b) applies and why; and (c) if a Flaring Incident falls under either Paragraph 29 or Subparagraph 30.b, states whether or not Merit asserts a defense to the Flaring Incident, and if so, a description of the defense;

      vii.    To the extent that investigations of the causes and/or possible corrective actions still are underway on the due date of the report, a statement of the anticipated date by which a follow-up report fully conforming to the requirements of Subparagraphs 26.iv and 26.v shall be submitted; provided, however, that if Merit has not submitted a report or a series of reports containing the information required to be submitted under this Paragraph within the 45 Day time period set forth in this Paragraph 26 (or such additional time as EPA may allow) after the due date for the initial report for the Flaring Incident, the stipulated penalty provisions of Section X shall apply, but Merit shall retain the right to dispute, under the dispute resolution provision of this Consent Decree, any demand for stipulated penalties that was issued as a result of Merit's failure to submit the report required under this Paragraph within the time frame set forth. Nothing in this Paragraph shall be deemed to excuse Merit from its investigation, reporting, and corrective action obligations under this Section for any Flaring Incident which occurs after a Flaring Incident for which Merit has requested an extension of time under this Subparagraph 26.vii; and

viii.    To the extent that completion of the implementation of corrective action(s), if any, is not finalized at the time of the submission of the report required under this Paragraph, then, by no later than 30 Days after completion of the implementation of corrective action(s), Merit shall submit a report identifying the corrective action(s) taken and the dates of commencement and completion of implementation.

27.    Corrective Action.

a.    In response to any Flaring Incident occurring after the Date of Lodging, Merit shall take, as expeditiously as practicable, such interim and/or long-term corrective actions, if any, as are consistent with good engineering practice to minimize the likelihood of a recurrence of the Root Cause and all significant contributing causes of that Flaring Incident.

b.    If EPA does not notify Merit in writing within 45 Days of receipt of the report(s) required by Paragraph 26 (Investigation and Reporting) that it objects to one or more aspects of the proposed corrective action(s) and schedule(s) of implementation, if any, then that (those) action(s) and schedule(s) shall be deemed acceptable for purposes of compliance with Subparagraph 27.a of this Decree. EPA does not, however, by its failure to object to any corrective action that Merit may take in the future, warrant or aver in any manner that any corrective actions in the future shall result in compliance with the provisions of the Clean Air Act or its implementing regulations.

c.    If EPA objects, in whole or in part, to the proposed corrective action(s) and/or the schedule(s) of implementation or, where applicable, to the absence of such proposal(s) and/or schedule(s), it shall notify Merit and explain the basis for its objection (s) in writing within 45 Days following receipt of the report(s) required by Paragraph 26 (Investigation and

16

Reporting), and Merit shall respond to EPA's objection(s) within 15 Days of receipt of EPA's objection.

     d.    Nothing in this Subsection VI.E shall be construed to limit the right of Merit to take such corrective actions as it deems necessary and appropriate immediately following a Flaring Incident or in the period during preparation and review of any reports required under this Paragraph.

     28.    Stipulated Penalties for Flaring Incidents. The provisions of Paragraphs 29-30 are to be used by EPA in assessing stipulated penalties for Flaring Incidents occurring after the Date of Lodging and by the United States in demanding stipulated penalties under this Subsection VI.E.

     29.    The stipulated penalty provisions of Paragraph 66 shall apply to any Flaring Incident for which the Root Cause was one or more of the following acts, omissions, or events:

     i.    Error resulting from careless operation by Facility personnel;

     ii.    Failure to follow written procedures and/or any of the General Flaring Requirements specified by Paragraph 24; or

     iii.    A failure of equipment that is due to a failure by Merit to operate and maintain that equipment in a manner consistent with good engineering practice.

     30.    With respect to any Flaring Incident not identified in Paragraph 29, the following provisions shall apply:

     a.    First Time: If the Root Cause of the Flaring Incident was not a recurrence of the same Root Cause that resulted in a previous Flaring Incident that occurred since the Date of Lodging, then:

17

(1)      If the Root Cause of the Flaring Incident was sudden, infrequent,

and not reasonably preventable through the exercise of good engineering practice, then that

cause shall be designated as an agreed-upon "Malfunction" for purposes of reviewing subsequent

Flaring Incidents;

(2)      If the Root Cause of the Flaring Incident was sudden and

infrequent, and was reasonably preventable through the exercise of good engineering practice,

then Merit shall implement Corrective Action(s) pursuant to Paragraph 27, and the stipulated

penalty provisions of Paragraph 66 shall not apply.

    b.      Recurrence:  If the Root Cause is a recurrence of the same Root Cause that

resulted in a previous Flaring Incident that occurred since the Entry Date, then Merit shall be

liable for stipulated penalties under Paragraph 66 unless:

(1)      the Flaring Incident resulted from a Malfunction; or

(2)      the Root Cause previously was designated as an agreed-upon

Malfunction under Subparagraph 30.a.(1); or

(3)      the Flaring Incident had as its Root Cause the recurrence of a Root

Cause for which Merit had previously developed, or was in the process of developing, a

corrective action plan for which Merit had not yet completed implementation.

    31.     Defenses.  Merit may raise the following affirmative defenses in response to a

demand by the United States for stipulated penalties:

    i.      *Force majeure* as defined in Section XI

    ii.     As to Paragraph 29, the Flaring Incident does not meet the identified

criteria.

18

iii.    As to Paragraph 30, the Flaring Incident was not a recurrence for which stipulated penalties are payable under Subparagraph 30.b and/or was due to a Malfunction.

32.    Emission Calculations.

a.    Calculation of the Quantity of Sulfur Dioxide Emissions Resulting from a Flaring Incident. For purposes of this Consent Decree, the quantity of $SO_2$ emissions resulting from a Flaring Incident shall be calculated by the following formula:

Tons of $SO_2$ = [FR][TD][Conc$H_2$S][8.44 x 10-5]

For purposes of determining the occurrence of, or the total quantity of $SO_2$ emissions resulting from, a Flaring Incident that is comprised of intermittent flaring, the quantity of $SO_2$ emitted shall be equal to the sum of the quantities of $SO_2$ flared during each 24-hour period starting when the gas was first flared.

b.    Meaning of Variables and Derivation of Multipliers Used in the Equations in this Paragraph 32:

FR =    Average Flow Rate to Flaring Device(s) during Flaring Incident in standard cubic feet per hour

TD =    Total Duration of Flaring Incident in hours

Conc$H_2$S =    Average Concentration of Hydrogen Sulfide in gas during Flaring Incident (or immediately prior to Flaring Incident if all gas is being flared) expressed as a volume fraction (scf $H_2$S/scf gas)

8.44 x 10-5 =    [lb mole $H_2$S/379 scf $H_2$S][64 lbs $SO_2$/lb mole $H_2$S][Ton/2000 lbs]

33.    The flow of gas to the Flaring Device(s) ("FR") shall be as measured by the relevant flow meter or reliable flow estimation parameters. Hydrogen sulfide concentration ("Conc$H_2$S") shall be determined from the SRU feed gas analyzer, from knowledge of the sulfur

19

content of the process gas being flared, by direct measurement by Tutwiler or Draeger (or other colorimetric) tube analysis or by any other method approved by EPA. In the event that any of these data points is unavailable or inaccurate, the missing data point(s) shall be estimated according to best engineering judgment. The report required under Paragraph 26 (Investigation and Reporting) shall include the data used in the calculation and an explanation of the basis for any estimates of missing data points

**F.    Review And Approval Of Submittals**

34.    Approval of Deliverables. After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA shall in writing: a) approve the submission; b) approve the submission upon specified conditions; c) approve part of the submission and disapprove the remainder; or d) disapprove the submission.

35.    If the submission is approved pursuant to Paragraph 34.a, Merit shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part, pursuant to Paragraph 34.b or 34.c, Merit shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Merit's right to dispute only the specified conditions or the disapproved portions, under Section XII of this Decree (Dispute Resolution).

36.    If the submission is disapproved in whole or in part pursuant to Paragraph 34.c or 34.d, Merit shall, within 30 Days or such other time as EPA agrees to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for

20

approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Merit shall proceed in accordance with the preceding Paragraph.

37.     Any stipulated penalties applicable to the original submission, as provided in Section X of this Decree, shall accrue during the 30 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Merit's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

38.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Merit to correct any deficiencies, in accordance with the preceding Paragraphs, or may correct any deficiencies itself, subject to Merit's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

**G.     Permits**

39.     Duty to Seek and Obtain Required Permits. Where any compliance obligation under this Section requires Merit to obtain a federal, state, or local permit or approval, Merit shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Merit may seek relief under the provisions of Section XI of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Merit has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

21

40.     Permits to Incorporate Emission Limits and Standards Effective on the Effective
Date. By no later than 120 Days after the Effective Date, Merit shall submit administratively
complete applications to the applicable federal, state, or local agency to incorporate the emission
limits and standards, including NSPS Subpart LLL applicability, required by this Consent
Decree that are effective as of the Effective Date into federally-enforceable minor or major new
source review permits or other permits that will ensure that the underlying emission limits and
standards survive the termination of this Consent Decree under Section XX. Following
submission of the complete permit applications, Merit shall cooperate with the applicable
federal, state, or local agency by promptly submitting to the applicable agency all available
information that the applicable agency seeks following its receipt of the permit materials.
Promptly upon issuance of such permits or in conjunction with such permitting, Merit shall file
any applications necessary to incorporate the requirements of those permits into any Title V
Permit that may be required to operate the Facility. Among other things, the application shall
include a request to remove any non-applicability provisions (*e.g.*, Title V Permit shield
provisions) that are inconsistent with the air regulatory requirements that apply to the operation
of the Facility prior to and after implementation of the Final Pollution Control Measures set forth
in Subsection VI.C of this Decree.

41.     Permits to Incorporate Future Emission Limits and Standards. As soon as
practicable, but in no event later than 120 Days after the effective date of any emission limit or
standard under Section VI that becomes effective after the Effective Date, Merit shall submit
complete applications to the applicable federal, state, or local agency to incorporate that
emission limit or standard into a federally-enforceable minor or major new source review
permit(s) as necessary to ensure that the underlying emission limit or standard survives the

22

termination of this Consent Decree under Section XX. Following submission of the complete
permit application, Merit shall cooperate with the applicable federal, state, or local agency by
promptly submitting to the applicable agency all available information that the applicable agency
seeks following its receipt of the permit materials. Promptly upon issuance of such permits or in
conjunction with such permitting, Merit shall file any applications necessary to incorporate the
requirements of those permits into any Title V Permit that may be required to operate the
Facility.

42.    Merit shall submit a copy of any application for any air permit or air permit
amendment required by this Consent Decree (or any related correspondence) to EPA (to the
addresses provided in Section XVI (Notices)) at the same time that the application or
correspondence is submitted to MDEQ. Within 15 Days of receipt of any draft or final air
permit, Merit shall provide a copy of the same to EPA (to the addresses provided in Section XVI
(Notices)).

## VII. SUPPLEMENTAL ENVIRONMENTAL PROJECT

43.    Merit shall implement a Supplemental Environmental Project ("SEP"), known as
the Electric Compressor Drive Project, in accordance with all provisions of Appendix A of this
Consent Decree. As specified by Appendix A, the SEP shall be completed within 17 months
after entry of this Decree. The SEP shall consist of replacing natural gas fired internal
combustion engines with electric compressor drives, resulting in the elimination of air pollutant
emissions from three units near the Facility.

44.    Merit is responsible for the satisfactory completion of the SEP in accordance with
the requirements of this Decree. Merit may use contractors or consultants in planning and
implementing the SEP.

23

45.    With regard to the SEP, Merit certifies the truth and accuracy of each of the following:

a.    that all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that Merit in good faith estimates that the capital and other one-time costs to implement the SEP are approximately $1,000,000;

b.    that, as of the date of executing this Decree, Merit is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

c.    that the SEP is not a project that Merit was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

d.    that Merit has not received and will not receive credit for the SEP in any other enforcement action;

e.    that Merit will not receive any reimbursement for any portion of the SEP from any other person; and

f.    that for Federal Income Tax purposes, Merit agrees that it will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEP.

46.    SEP Completion Report

a.    Within 30 Days after the date established for completion of the SEP in Paragraph 43, Merit shall submit a SEP Completion Report to the United States, in accordance with Section XVI of this Consent Decree (Notices). The SEP Completion Report shall contain the following information:

24

      i.      a detailed description of the SEP as implemented;

      ii.     a description of any problems encountered in completing the SEP

and the solutions thereto;

      iii.    an itemized list of all eligible SEP costs expended;

      iv.    certification that the SEP has been fully implemented pursuant to

the provisions of this Decree; and

      v.     a description of the environmental and public health benefits

resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

47.    EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate Merit's completion report.

48.    After receiving the SEP Completion Report, the United States shall notify Merit whether or not Merit has satisfactorily completed the SEP. If Merit has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section X of this Consent Decree.

49.    Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XII of this Decree (Dispute Resolution). No other disputes arising under this Section shall be subject to Dispute Resolution.

50.    Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 57.

51.    Any public statement, oral or written, in print, film, or other media, made by Merit making reference to the SEP under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United

25

States v. Merit Energy Company, LLC and Shell Exploration & Production Co., taken on behalf

of the U.S. Environmental Protection Agency under the Clean Air Act."

## VIII. POLLUTION ALLOWANCES

52.     Merit may not obtain or receive any emissions allowances, credits, or offsets for

any of the following pollutants for any actions required by Section VI of this Consent Decree:

$SO_2$, sulfuric acid mist, $H_2S$, total reduced sulfur (including $H_2S$), and reduced sulfur compounds

(including $H_2S$). This prohibition includes both those pollution emissions programs that exist as

of the Date of Lodging and any programs that are enacted after the Date of Lodging.

53.     Merit shall not generate or use any emissions allowances for any of the pollutants

identified in the preceding Paragraph, or apply for and obtain any emission reduction credits for

such pollutants, that result from any projects conducted or controls required pursuant to Section

VI of this Consent Decree as netting reductions or emissions offsets in any PSD, major non-

attainment and/or synthetic minor New Source Review ("NSR") permit or permit proceeding.

## IX. REPORTING REQUIREMENTS

54.     Merit shall submit the following reports:

a.      Within 30 Days after the end of each calendar-quarter after lodging of this

Consent Decree until termination of this Decree pursuant to Section XX, Merit shall submit to

EPA a report for the preceding quarter that sets forth: (i) its current plan for compliance with

Subsection VI.C (Final Pollution Control Measures); (ii) the status of any construction or

compliance measures; (iii) completion of milestones; (iv) problems encountered or anticipated,

together with implemented or proposed solutions; (v) status of permit applications; (vi) operation

and maintenance activities; (vii) reports to state agencies; and (viii) a discussion of its progress

in satisfying its obligations in connection with the Electric Compressor Drive Project under

26

Section VII (Supplemental Environmental Projects) of this Decree including, at a minimum, a narrative description of activities undertaken, status of any construction or compliance measures, including the completion of any milestones set forth in the SEP Scope of Work attached as Appendix A to this Decree, and a summary of costs incurred since the previous report. The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. The first such report shall be due within 30 Days after the end of the first full calendar quarter after the Date of Lodging.

b.    If Merit violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Merit shall notify the United States of such violation and its likely duration, in writing, within ten working days of the day it first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Merit shall so state in the report. Merit shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the day it becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Merit of its obligation to provide the notice required by Section XI of this Consent Decree (Force Majeure).

55.    Whenever any violation of this Consent Decree or any other event affecting Merit's performance under this Decree, or the performance of the Facility, may pose an immediate threat to the public health or welfare or the environment, Merit shall notify EPA orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours

27

after Merit first knew of the violation or event. This procedure is in addition to the requirements

set forth in the preceding Paragraph.

56.    All reports shall be submitted to the persons designated in Section XVI of this

Consent Decree (Notices).

57.    Each report submitted by Merit under this Section shall be signed by a Merit

official and include the following certification:

> I certify under penalty of law that this document and all
> attachments were prepared under my direction or supervision in
> accordance with a system designed to assure that qualified
> personnel properly gather and evaluate the information submitted.
> Based on my inquiry of the person or persons who manage the
> system, or those persons directly responsible for gathering the
> information, the information submitted is, to the best of my
> knowledge and belief, true, accurate, and complete. I am aware
> that there are significant penalties for submitting false information,
> including the possibility of fine and imprisonment for knowing
> violations.

This certification requirement does not apply to emergency or similar notifications where

compliance would be impractical.

58.    The reporting requirements of this Consent Decree do not relieve Defendants of

any reporting obligations required by the Act or implementing regulations, or by any other

federal, state, or local law, regulation, permit, or other requirement.

59.    Any information provided pursuant to this Consent Decree may be used by the

United States in any proceeding to enforce the provisions of this Consent Decree and as

otherwise permitted by law.

## X. STIPULATED PENALTIES

60.    Merit shall be liable for stipulated penalties to the United States for violations of

this Consent Decree as specified below, unless excused under Section XI (Force Majeure) or

28

Paragraph 31 (Defenses). Merit and Shell shall be jointly and severally liable for stipulated penalties to the United States as specified by Paragraph 61. A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

61.    Late Payment of Initial Payment. If Defendants fail to make the initial payment as required under Paragraph 8 in Section V of this Decree (Civil Penalty), Defendants shall pay a stipulated penalty of $15,000 per Day for each Day that the payment is late.

62.    NSPS Requirements. If Merit fails to comply with any requirement imposed by NSPS Subparts A or LLL at the Facility, as required by Paragraph 11, Merit shall pay stipulated penalties as follows:

| Period of Non-Compliance | Penalty per day |
| --- | --- |
| 1st through 30th day | $1,000 |
| Beyond 31st day | $2,000 |
| Beyond 60th day | $5,000 |

63.    Interim Emission Standard. If Merit fails to comply with any of the Interim Emission Standard requirements imposed by Paragraph 12, Merit shall pay $2,000 for each day of violation. Solely for the purpose of this Paragraph, a day on which the 30-day rolling average Recovery Efficiency exceeds the specified Reduction Efficiency limit shall count as one day of violation (rather than 30 days of violation).

64.    Final Pollution Control Measures. If Merit fails to implement one of the Final Pollution Control Measure options as required by Section VI.C, Merit shall pay stipulated penalties as follows:

29

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $2,000 |
| 31st through 60th day | $10,000 |
| Over 60 days | $20,000 |

65.    Requirements Applicable to Specific Control Options. If Merit implements the

AGI System Final Air Pollution Control Measure required by Section VI.C, but fails to comply

with any Consent Decree requirement that is applicable to such option, Merit shall pay stipulated

penalties as follows:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| 31st through 60th day | $2,000 |
| Over 60 days | $5,000 |

Stipulated penalties shall accrue under Paragraph 64 for any violation of requirements relating to

the implementation of the Facility Shutdown Final Air Pollution Control Measure.

66.    Flaring Incidents. For any Flaring Incident which results in the accrual of a

stipulated penalty of under Subsection VI.E, Merit shall pay a stipulated penalty of $2,000 per

ton of $SO_2$ emitted by the Flaring Incident. For the purpose of this Paragraph, the quantity of

$SO_2$ emitted shall be rounded to one decimal point. (Thus, for example, for a calculation that

results in a number equal to 1.450 tons, the quantity of $SO_2$ emitted shall be rounded to 1.5 tons.)

67.    SEP Compliance.

a.    If Merit fails to meet any of the interim milestones in Appendix A for

implementing the SEP, Merit shall pay stipulated penalties for each failure to meet an applicable

deadline, as follows:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| Beyond 31st day | $2,500 |
| Beyond 60th day | $5,000 |

30

b.      If Merit fails to satisfactorily complete the SEP by the deadline set forth in

Section VII, Merit shall pay stipulated penalties for each day for which it fails to satisfactorily

complete the SEP, as follows:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $2,000 |
| Beyond 31st day | $5,000 |
| Beyond 60th day | $10,000 |

c.      If Merit fails to implement the SEP, or abandons work on the SEP, Merit

shall pay a stipulated penalty of $1.2 million. The penalty under this Subparagraph shall accrue

as of the date specified for completing the SEP or the date performance ceases, whichever is

earlier.

68.      Reporting Requirements. The following stipulated penalties shall accrue per

violation per Day for each violation of the reporting requirements of Sections VI, VII and IX of

this Consent Decree:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| Beyond 31st day | $2,000 |
| Beyond 60th day | $5,000 |

69.      Except as provided in Subparagraph 67.c, above, stipulated penalties under this

Section shall begin to accrue on the Day after performance is due or on the Day a violation

occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily

completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for

separate violations of this Consent Decree.

70.      Merit shall pay any stipulated penalty within 30 Days of receiving the United

States' written demand.

31

71.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

72.     If Merit seeks to invoke the Dispute Resolution procedures in Section XII to contest any stipulated penalties demanded under this Decree, Merit shall take the following steps within 30 Days of receiving the United States' written demand: (i) Merit shall establish an escrow account, at a federally chartered bank, that will bear interest on commercially reasonable terms; (ii) Merit shall remit to that escrow account funds equivalent to the amount of the contested stipulated penalties demanded by the United States; and (iii) Merit shall send the United States a written Notice of Dispute pursuant to Paragraph 83, which shall include information documenting Merit's compliance with the requirements of this Paragraph.

73.     Stipulated penalties for any ongoing non-compliance shall continue to accrue as provided in Paragraph 69, during any Dispute Resolution, but need not be paid until the following:

        a.      If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Merit shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

        b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, Merit shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

32

     c.    If any Party appeals the District Court's decision, Merit shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

74.    Merit shall pay stipulated penalties owed to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided by the Financial Litigation Unit of the U.S. Attorney's Office for the Western District of Michigan, 330 Ionia Avenue, N.W., Suite 501, Grand Rapids, Michigan 49503, phone number 616-456-2404. At the time of payment, Merit shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the stipulated penalties owed pursuant to the Consent Decree in United States v. Merit Energy Company, LLC, et al., and shall reference the civil action number and DOJ case number 90-5-2-1-09003, to the United States in accordance with Section XVI of this Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio 45268

75.    If Merit fails to pay stipulated penalties according to the terms of this Consent Decree, Merit shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Merit's failure to pay any stipulated penalties.

76.    Subject to the provisions of Section XIV of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for

33

Defendants' violation of this Consent Decree or applicable law. Where a violation of this
Consent Decree is also a violation of the Act or federal or State regulations implementing the
Act, Defendants shall be allowed a credit, for any stipulated penalties paid, against any statutory
penalties imposed for such violation.

## XI. FORCE MAJEURE

77.    "Force majeure," for purposes of this Consent Decree, is defined as any event
arising from causes beyond the control of Merit, of any entity controlled by Merit, or of Merit's
contractors, that delays or prevents the performance of any obligation under this Consent Decree
despite Merit's best efforts to fulfill the obligation. The requirement that Merit exercise "best
efforts to fulfill the obligation" includes using best efforts to anticipate any potential force
majeure event and best efforts to address the effects of any such event (a) as it is occurring and
(b) after it has occurred to prevent or minimize any resulting delay to the greatest extent
possible. "Force majeure" does not include Merit's financial inability to perform any obligation
under this Consent Decree.

78.    If any event occurs or has occurred that may delay the performance of any
obligation under this Consent Decree, whether or not caused by a force majeure event, Merit
shall provide notice by electronic or facsimile transmission to EPA within 10 Days after Merit
first knew that the event might cause a delay. In the notice, Merit shall provide in writing to
EPA an explanation and description of the reasons for the delay; the anticipated duration of the
delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for
implementation of any measures to be taken to prevent or mitigate the delay or the effect of the
delay; Merit's rationale for attributing such delay to a force majeure event if it intends to assert
such a claim; and a statement as to whether, in the opinion of Merit, such event may cause or

34

contribute to an endangerment to public health, welfare or the environment. Merit shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Merit from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Merit shall be deemed to know of any circumstance of which Merit, any entity controlled by Merit, or Merit's contractors knew or should have known.

79.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Merit in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

80.    If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Merit in writing of its decision.

81.    If Merit elects to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, Merit shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Merit complied with the requirements of Paragraphs 77 and 78, above. If Merit carries this

35

burden, the delay at issue shall be deemed not to be a violation by Merit of the affected obligation of this Consent Decree identified to EPA and the Court.

## XII. DISPUTE RESOLUTION

82.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Merit's failure to seek resolution of a dispute under this Section shall preclude Merit from raising any such issue as a defense to an action by the United States to enforce any obligation arising under this Decree.

83.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Merit sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Merit invokes formal dispute resolution procedures as set forth below.

84.     Formal Dispute Resolution. Merit shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Merit's position and any supporting documentation relied upon by Merit.

36

85.    The United States shall serve its Statement of Position within 30 Days of receipt of Merit's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Merit, unless Merit files a motion for judicial review of the dispute in accordance with the following Paragraph.

86.    Merit may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XVI of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 20 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Merit's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

87.    The United States shall respond to Merit's motion within the time period allowed by the Local Rules of this Court. Merit may file a reply memorandum, to the extent permitted by Court order or the Local Rules.

88.    Standard of Review

a.    Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 84 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are

37

accorded review on the administrative record under applicable principles of administrative law, Merit shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

        b.      Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 84, Merit shall bear the burden of demonstrating that its position complies with this Consent Decree and best furthers the objectives of the Consent Decree.

        89.     The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraphs 72 and 73. If Merit does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

### XIII. INFORMATION COLLECTION AND RETENTION

        90.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility and any other location covered by this Consent Decree, including facilities addressed by the SEP, at all reasonable times, upon presentation of credentials, to:

        a.      monitor the progress of activities required under this Consent Decree;

        b.      verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

38

       c.     obtain samples and, upon request, splits of any samples taken by Merit or its representatives, contractors, or consultants;

       d.     obtain documentary evidence, including photographs and similar data; and

       e.     assess Merit's compliance with this Consent Decree.

91.     Upon request, Merit shall provide EPA or its authorized representatives splits of any samples taken by Merit. Upon request, EPA shall provide Merit splits of any samples taken by EPA.

92.     Until two years after the termination of this Consent Decree, Merit shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Merit's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Merit shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

93.     At the conclusion of the information-retention period provided for in the preceding Paragraph, Merit shall notify the United States in writing at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon written request by the United States, Merit shall deliver any such documents, records, or other information to EPA. Merit may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other

39

privilege recognized by federal law. If Merit asserts such a privilege, Merit shall provide the

following: (1) the title of the document, record, or information; (2) the date of the document,

record, or information; (3) the name and title of each author of the document, record, or

information; (4) the name and title of each addressee and recipient; (5) a description of the

subject of the document, record, or information; and (6) the privilege asserted. However, no

documents, records, or other information created or generated pursuant to the requirements of

this Consent Decree shall be withheld on grounds of privilege.

94.     Merit may also assert that information required to be provided under this Section

is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any

information that Merit seeks to protect as CBI, Merit shall follow the procedures set forth in 40

C.F.R. Part 2.

95.     This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States pursuant to applicable federal laws,

regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to

maintain documents, records, or other information imposed by applicable federal or state laws,

regulations, or permits.

## XIV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

96.     This Consent Decree resolves the civil claims of the United States for the

violations alleged in the Complaint that was filed in this action through the Date of Lodging.

97.     The United States reserves all legal and equitable remedies available to enforce

the provisions of this Consent Decree, except as expressly stated in Paragraph 96. This Consent

Decree shall not be construed to limit the rights of the United States to obtain penalties or

injunctive relief under the Act or implementing regulations, or under other federal laws,

40

regulations, or permit conditions, except as expressly specified in Paragraph 96. The United

States further reserves all legal and equitable remedies to address any imminent and substantial

endangerment to the public health or welfare or the environment arising at, or posed by, the

Facility, whether related to the violations addressed in this Consent Decree or otherwise.

98.     In any subsequent administrative or judicial proceeding initiated by the United

States for injunctive relief, civil penalties, or other appropriate relief relating to the Facility,

Defendants shall not assert, and may not maintain, any defense or claim based upon the

principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-

splitting, or other defenses based upon any contention that the claims raised by the United States

in the subsequent proceeding were or should have been brought in the instant case, except with

respect to claims that have been specifically resolved pursuant to Paragraph 96 of this Section.

99.     This Consent Decree is not a permit, or a modification of any permit, under any

federal, State, or local laws or regulations. Merit is responsible for achieving and maintaining

complete compliance with all applicable federal, State, and local laws, regulations, and permits;

and Merit's compliance with this Consent Decree shall be no defense to any action commenced

pursuant to any such laws, regulations, or permits, except as set forth herein. The United States

does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that

Merit's compliance with any aspect of this Consent Decree will result in compliance with

provisions of the Act, 42 U.S.C. § 7401 *et seq.*, or with any other provisions of federal, State, or

local laws, regulations, or permits.

100.    This Consent Decree does not limit or affect the rights of Defendants or of the

United States against any third parties not party to this Consent Decree, nor does it limit the

41

rights of third parties not party to this Consent Decree against Defendants, except as otherwise

provided by law.

101.    This Consent Decree shall not be construed to create rights in, or grant any cause

of action to, any third party not party to this Consent Decree.

## XV.  COSTS

102.    The Parties shall bear their own costs of this action, including attorneys' fees,

except that the United States shall be entitled to collect the costs (including attorneys' fees)

incurred in any action necessary to collect any portion of:  (i) the initial payment to be made by

the Defendants under Paragraph 8; or (ii) any stipulated penalties due but not paid by Merit.

## XVI.  NOTICES

103.    Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

To the United States:

   To the Department of Justice:

   Chief, Environmental Enforcement Section
   Environment and Natural Resources Division
   U.S. Department of Justice
   Box 7611
   Washington, D.C.  20044-7611
   Re: DOJ No. 90-5-2-1-09003

   To EPA:

   Chief
   Air Enforcement and Compliance Assurance Branch
   U.S. Environmental Protection Agency
   Region 5
   77 W. Jackson Blvd. (AE-17J)
   Chicago, IL 60604

42

and

Manoj P. Patel
Environmental Engineer
Air Enforcement and Compliance Assurance Branch
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL 60604
Email: Patel.Manojkumar@epamail.epa.gov

and

Christine Liszewski
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, IL 60604

To Merit:

Scott Gladden, Esq.
General Counsel
Merit Energy Company, LLC
13727 Noel Road, Suite 500
Dallas, TX   75240

and

Jeffrey W. Schwarz, Esq.
Carver, Schwarz, McNab & Bailey, LLC
1600 Stout Street, Suite 1700
Denver, CO   80202

To Shell:

Lance Tolson, Senior Legal Counsel
Shell Oil Company
900 Louisiana Street
OSP 4874
Houston, TX 77002

and

Jerome I. Maynard
Dykema
10 S. Wacker, Suite 2300
Chicago, IL 60606

104.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

105.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVII. EFFECTIVE DATE

106.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendants hereby agree that they shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVIII. RETENTION OF JURISDICTION

107.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XII (Dispute Resolution) and XIX (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XIX. MODIFICATION

108.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

109.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XII of this Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 88, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX. TERMINATION

110.    This Consent Decree shall terminate as to Shell upon the United States' receipt of the disbursement from the Court Registry Account pursuant to Paragraph 9, as payment of the civil penalty required by Consent Decree Section V.

111.    After payment of the civil penalty and any accrued stipulated penalties as required by this Consent Decree, and after Merit has completed the requirements of Section VI (Compliance Requirements) of this Decree, has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of three years, has complied with all other requirements of this Consent Decree, including those relating to the SEP required by Section VII of this Consent Decree, and has obtained permits incorporating the requirements of this Consent Decree as set forth in Subsection VI.G, Merit may serve upon the United States a Request for Termination, stating that Merit has satisfied those requirements, together with all necessary supporting documentation.

112.    Following receipt by the United States of Merit's Request for Termination, the
United States and Merit shall confer informally concerning the Request and any disagreement
that they may have as to whether Merit has satisfactorily complied with the requirements for
termination of this Consent Decree. If the United States agrees that the Decree may be
terminated, the United States and Merit shall submit, for the Court's approval, a joint stipulation
terminating the Decree.

113.    If the United States does not agree that the Decree may be terminated, Merit may
invoke Dispute Resolution under Section XII of this Decree. However, Merit shall not seek
Dispute Resolution of any dispute regarding termination, under Paragraph 84 of Section XII,
until 60 Days after service of its Request for Termination.

## XXI. PUBLIC PARTICIPATION

114.    This Consent Decree shall be lodged with the Court for a period of not less than
30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States
reserves the right to withdraw or withhold its consent if the comments regarding the Consent
Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,
improper, or inadequate. Defendants consent to entry of this Consent Decree without further
notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to
challenge any provision of the Decree, unless the United States has notified Defendants in
writing that it no longer supports entry of the Decree.

## XXII. SIGNATORIES/SERVICE

115.    Each undersigned representative of Defendants and the undersigned delegate of

the Attorney General certifies that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind the Party he or she represents

to this document.

116.    This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis. Defendants agree to accept service of process by mail with respect to

all matters arising under or relating to this Consent Decree and to waive the formal service

requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

applicable Local Rules of this Court including, but not limited to, service of a summons. The

Parties agree that the Defendants need not file an answer to the complaint in this action unless or

until the Court expressly declines to enter this Consent Decree.

## XXIII. INTEGRATION/APPENDICES

117.    This Consent Decree constitutes the final, complete, and exclusive agreement and

understanding among the Parties with respect to the settlement embodied in the Decree and

supersedes all prior agreements and understandings, whether oral or written, concerning the

settlement embodied herein. No other document, nor any representation, inducement,

agreement, understanding, or promise, constitutes any part of this Decree or the settlement it

represents, nor shall it be used in construing the terms of this Decree.

118.    The following appendices are attached to and incorporated into this Consent

Decree:

"Appendix A" is the Electric Compressor Drive Supplemental Environmental Project

Scope of Work.

47

## XXIV. FINAL JUDGMENT

119.    Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court as to the United States and Defendants.


Dated and entered this _____ day of _____, 2008.


_____
UNITED STATES DISTRICT JUDGE
Western District of Michigan

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
*United States v. Merit Energy Company, LLC et al. (W.D. Mich.).*

**FOR PLAINTIFF UNITED STATES OF AMERICA**


RONALD J. TENPAS
Assistant Attorney General
Environmental and Natural Resources Division
United States Department of Justice


RANDALL M. STONE
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
P.O. Box 7611
Washington, DC   20044-7611
(202) 514-1308


CHARLES R. GROSS
Interim United States Attorney

MICHAEL L. SHIPARSKI
Assistant United States Attorney
Western District of Michigan
P.O. Box 208
Grand Rapids, MI   49503
(616) 456-2404

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
*United States v. Merit Energy Company, LLC et al. (W.D. Mich.).*

**FOR PLAINTIFF UNITED STATES OF AMERICA**


GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


ADAM M. KUSHNER
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
*United States v. Merit Energy Company, LLC et al. (W.D. Mich.).*

**FOR PLAINTIFF UNITED STATES OF AMERICA**

GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

ADAM M. KUSHNER
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
<u>*United States v. Merit Energy Company, LLC et al.*</u> *(W.D. Mich.).*

**FOR PLAINTIFF UNITED STATES OF AMERICA**

LYNN BUHL
Regional Administrator
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Boulevard
Chicago, IL 60604

CHRISTINE M. LISZEWSKI
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Boulevard
Chicago, IL 60604

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
*United States v. Merit Energy Company, LLC et al. (W.D. Mich.).*

**FOR DEFENDANT MERIT ENERGY COMPANY, LLC**

7/23/08
─────────
Date

Scott Gladden, Esq.
General Counsel
Merit Energy Company, LLC
13727 Noel Road, Suite 500
Dallas, TX  75240

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of*
*United States v. Merit Energy Company, LLC et al. (W.D. Mich.).*

**FOR DEFENDANT SHELL EXPLORATION & PRODUCTION COMPANY**

7/30/08
‾‾‾‾‾‾‾‾
Date

Elizabeth L. Cheney
EPW-VP Corporate Support Americas
Shell Energy Resources Company
200 North Dairy Ashford
Houston, Texas 77001-0576

APPENDIX A
ELECTRIC COMPRESSOR DRIVE SUPPLEMENTAL ENVIRONMENTAL PROJECT
SCOPE OF WORK

The Electric Compressor Drive Supplemental Environmental Project ("SEP") is designed to reduce emissions of $NO_x$, CO, VOC, $SO_2$ and PM-10 from three Merit Energy Company, LLC. facilities that are located within 35 miles of the Manistee 23 facility by replacing three natural gas fired internal combustion ("IC") compressor engines with electric compressor drives.

1.     Merit shall replace the following natural gas fired IC units with electric compressor drives:

     a. a Waukesha Model L 7042, 750 horsepower ("HP") engine powering a Worthington OF5SU, 4 cylinder unit 3 stage compressor at the Brown 7 facility located - in Manistee County, in Section 7, Township 22 North, Range 15 West.

     b. a Waukesha Model 5788, 550 HP engine powering a Worthington OF5SU, 4 cylinder unit 3 stage compressor at the Cleon 11 facility located in Manistee County, in Section 11, Township 24 North, Range 13 West.

     c. a Waukesha Model 7042, GSIU, 1000 HP engine powering a Worthington OF5SU, 4 cylinder unit 3 stage compressor at the Mayfield 19 facility located in Manistee County, in Section 19, Township 25 North, Range 11 West.

2.     By implementing this SEP, Merit will reduce emissions from facilities near the Manistee 23 facility by the amounts set forth in the following table (as compared to actual facility emissions in 2006):

| Facility | NOx | CO | VOC | SO2 | PM-10 |
|---|---|---|---|---|---|
| Mayfield 19 | 91.16 tpy | 6.22 tpy | 1.04 tpy | 0.01 tpy | 0.53 tpy |
| Cleon 11 | 27.89 tpy | 1.90 tpy | 0.23 tpy | 0 tpy | 0.20 tpy |
| Brown 7 | 60.32 tpy | 4.11 tpy | 0.49 tpy | 0.01 tpy | 0.38 tpy |
| Totals | 179.37 tpy | 12.23 tpy | 1.76 tpy | 0.02 tpy | 1.11 tpy |

Merit shall maintain and continue the emissions reductions associated with this SEP for at least five years.

3.      Merit estimates that it will spend no less than $1,000,000 in capital costs and one-time non-depreciable costs to complete this SEP. Merit also projects that the three replacements will collectively yield no net savings in annual recurring costs.

4.      Merit shall implement this SEP in accordance with the following schedule:

a. Within 2 weeks after the effective date of the Consent Decree, Merit shall commence any engineering and/or construction planning required for the project.

b. Within 10 weeks after the effective date of the Consent Decree, Merit shall complete any engineering and/or construction planning for the project and ordering the electric driven compressor packages.

c. Within 10 months after the effective date of the Consent Decree, the new electric driven compressor packages shall be delivered to the Brown 7, Cleon 11 and Mayfield 19 facilities described in Paragraph 1, above.

d. Within 13 months after the effective date of the Consent Decree, Merit shall complete the installation of the new electric driven compressor packages.

e. Within 15 months after the effective date of the Consent Decree, Merit shall begin operating the new electric driven compressor packages.

f. Within 17 months after the effective date of the Consent Decree, Merit shall disconnect the fuel piping to the three natural gas fired IC compressor engines that are to be replaced with the new electric driven compressor packages.

g. The deadlines specified above are subject to the Force Majeure provisions in Section XI of the Consent Decree.

5.      Merit shall not use or sell in any emission trading or marketing program of any kind any $NO_x$, $CO$, VOC, $SO_2$ and PM-10 emission allowances or credits resulting from the replacement of the three natural gas fired IC compressor engines with electric compressor drives pursuant to this SEP.

6.      Merit shall not use any $NO_x$, $CO$, VOC, $SO_2$ and PM-10 emission reductions generated as a result of the installation of three natural gas fired IC compressor engines with electric compressor drives pursuant to this SEP for the purpose of obtaining netting credits or offsets under the Clean Air Act's (the "Act") PSD (meaning the prevention of significant deterioration program within the meaning of Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, 40 C.F.R. Part 52 and Michigan State Implementation Plan ("SIP") ) or NSR (meaning the nonattainment area new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, 40 C.F.R. Part 51 and Michigan SIP) programs.

Appendix A – Page 2

7.    Merit may maintain the three disconnected natural gas IC engines as backups in the event of power loss or a malfunction of an electric drive. Merit shall only operate these natural gas IC engines during a loss of power if Merit cannot operate the electric compressor drives, or for a limited time period as necessary to address a malfunction of an electric drive.